## CASGRAIN *v.* HAMMOND.

PLEDGES—EQUITY—PRINCIPAL AND AGENT.
  Evidence examined and considered insufficient to establish the fact that defendant held stock of complainant as a pledge to secure a debt of complainant's husband.

Appeal from Wayne; Rohnert, J. Submitted April 5, 1911. (Docket No. 19.) Decided May 8, 1911.

Bill by Annie H. Casgrain against Charles F. Hammond to establish title to certain stock certificates. From a decree for defendant, complainant appeals. Reversed.

*Lucking, Emmons & Helfman,* for complainant.

*Thomas A. E. Weadock,* for defendant.

OSTRANDER, C. J. The issue between the parties arises out of facts which will be briefly stated. Complainant and defendant are sister and brother. In 1889, while the

complainant was in Europe, her husband, Charles W. Casgrain, who was her attorney in fact, bought, and, out of certain moneys which she had left in his control, paid $2,300 for 1,000 shares of the capital stock of the Iron Silver Mining Company. Because he had bought the stock to be sold again, the shares were issued in his name. The Hammond heirs, of whom complainant and defendant are two, had a common office, and each had access to the safe in the office, where papers were kept. Mr. Casgrain also had access to the safe. Complainant, upon her return in March, 1890, was informed by her husband of the purchase of the stock. It had declined in market value and for a number of years was of only nominal value. No dividends were paid on the stock after its purchase, until 1901. This Mr. Casgrain collected and kept, as well as dividends for 1902 and 1903. In September, 1895, the complainant again went to Europe for an extended visit, making her brother, the defendant, her attorney in fact and agent to attend to her affairs in her absence, it being understood that complainant's husband would shortly follow her to Europe, which he did in October of the same year. Mr. Casgrain was indebted to the defendant. At least, defendant held certain evidences of indebtedness. It is admitted that before his departure he took the certificates of stock which have been referred to, indorsed them in blank, and gave them to the defendant. It is the contention of the defendant that Mr. Casgrain delivered the certificates to him as security for the payment of his personal debt. It is the contention of complainant and her husband that, in closing up matters before his departure, he happened upon these certificat⌄ ˗ of stock among other papers, handed them to the defendant, indorsed in blank, telling him that the stock belonged to complainant, and should be transferred in her name. Defendant's version of what took place is that Mr. Casgrain said he could not pay his debt; that he would leave this stock with him, and if anything happened to him defendant would be protected; that if there was any equity in the stock he

wanted complainant to get it; that the whole proceeding was voluntary on the part of Mr. Casgrain; no request having been made for any security.

Complainant learned that the defendant claimed a lien upon the stock in 1905, demanded the stock, and, in January, 1906, filed her bill of complaint in this cause, praying, among other things, that she be decreed to be the owner of the stock and entitled to its possession, and that the defendant be required to surrender it to her. Defendant answered and filed a cross-bill, bringing in the Iron Silver Mining Company and Charles W. Casgrain as defendants. The cause came on for hearing in October, 1906, when proofs were taken in open court and the matter submitted to the court for determination. The court rendered an opinion April 6, 1910, which was followed by a decree, dated May 9, 1910, which found complainant to be the owner of the stock, subject to a pledge to the defendant made by Charles W. Casgrain for his indebtedness to defendant, and ordering an accounting as to the amount of the said indebtedness.

The theory according to which the court made the decree appears from the opinion which was filed, and is, in substance, that complainant had given her husband authority to deal with her property in such a way, and had for so long a time permitted his dealings to go unquestioned, and without inquiry, that she was estopped from questioning the right of the defendant to claim his lien upon the stock. The essential fact in this theory—a fact which the court finds to be true—is that Mr. Casgrain did pledge this stock to the defendant as collateral to his note. A subsidiary, but material, fact he found to be that, although he received the stock as collateral to an existing indebtedness, defendant afterwards acted in such a way, in reliance upon the pledge, that injury would result to him if he should be denied the right to enforce it.

We are not satisfied that the stock was pledged to the defendant by Mr. Casgrain, and, this being so, we need not consider certain legal propositions advanced by the

court and argued by counsel in support of the decree which was entered. The preponderance of testimony requires us to find that the defendant never received this stock as a pledge for Mr. Casgrain's debt. If he did not, there is, of course, no theory according to which he may retain possession of the certificates as against the complainant. Some of the considerations which lead us to this conclusion may be stated.

The stock was undoubtedly—admittedly—the property of the complainant, purchased with her money for her by her attorney in fact. There was no reason why Mr. Casgrain should use this property belonging to his wife as security for his personal debt. No security was demanded of him. On the other hand, it was a reasonable and prudent thing for Mr. Casgrain, before his departure for an extended visit in Europe, where his wife then was, to deliver these certificates standing in his name to the attorney in fact for his wife, with the statement that they belonged to his wife and ought to be transferred in her name. While Mr. and Mrs. Casgrain were in Europe, the defendant wrote to Mr. Casgrain in reference to this stock. Defendant says that in his letter he stated that financial conditions were troublesome, that he was in need of money and would probably have to hypothecate the stock to obtain money, and he wished Casgrain to know about this before he did hypothecate the stock. He says he never had a reply to this letter. He never did, in fact, hypothecate the stock. Mr. Casgrain says of this letter that in it defendant asked him (Casgrain) to talk it over with Mrs. Casgrain, and that he (Casgrain) answered the letter, stating that defendant would be permitted to use the stock for his own purposes.

In February, 1904, according to the testimony of Mr. Casgrain, defendant came to his office, called his attention to a note evidencing an indebtedness of Casgrain to defendant, asked him if he was going to pay it, and, after some talk, said that he held 1,000 shares of Iron Silver stock as collateral.

"I said, 'That is the first I ever heard you make any such claim as that; you do not hold it as collateral for any indebtedness of that kind; you know I put that in your hands in 1895 to have you transfer it to Mrs. Casgrain's name, in Annie's name.' I said, 'I should like to know whether you can have that as collateral.' I said, 'I want to tell you you cannot have it as collateral.' * * * That is the only conversation I had with him with reference to the stock; that is, February 24, 1904."

Of this conversation, the defendant says that in the course of argument he might have said to Mr. Casgrain that he held the stock as collateral for his debt, and that Casgrain denied it, and that he can recollect of no conversation between himself and Mr. Casgrain about this stock from September, 1895, until the conversation in February, 1904, and no other communication upon the subject, except the letter written to Casgrain while he was in Europe.

The value of this stock, when it is said to have been pledged to the defendant as security, was about $1 a share. The principal sum of the debt which defendant claims that Mr. Casgrain then owed him was $3,000. It appears that, before the departure of his wife and himself for Europe in 1895, Mr. Casgrain sold to his wife for $2,500 the only piece of property he owned, or in which he had an interest, and that the transaction took place in the office of the defendant. Mr. Casgrain was an attorney at law and was occupying an office in the Hammond building, in which complainant and defendant (both of them) had an interest. His office rent was more than $1,000 a year, and for 10 years he paid no rent. During this period, or part of it, Mr. Casgrain performed services both for the defendant and for the Hammond heirs. It does not appear that any of these matters were adjusted, or that, so long as the heirs were friendly with each other and with Mr. Casgrain, any one cared to adjust them.

The indifference of complainant upon the subject of this stock, her failure to seek it and to inquire about it, may be accounted for, partly by the fact of its greatly diminished value, partly by the fact that her husband, at least

up to 1895, had access to her papers, to which the defendant also, for a period at least, had access, and by the fact that she had no reason to suppose that any one but herself claimed to have any interest in the stock. She acted promptly, when advised of the claim of defendant. It is no more singular that the complainant should not have concerned herself about the certificates than it is that the defendant, during the same period, should have held them, fluctuating as they were in value, with knowledge that dividends were being paid upon them for a portion of the time, with knowledge that Mr. Casgrain was, or was supposed to be, financially irresponsible, without making some effort to realize upon his security.

The decree below is reversed, and a decree will be entered in this court in accordance with the prayer of the bill. Complainant will recover costs of both courts.

BIRD, HOOKER, MOORE, and McALVAY, JJ., concurred.